Wink v. Miller Compressing Company, Ms. Varang. Good morning. May it please the Court. My name is Susan Lawrence, and I represent the Wink v. Miller Compressing Company, Ms. Varang. The appeal before this court is an appeal from the denial before the District Court of our Rule 50b Motion for Judgment as a Matter of Law on Appellee Tracy Wink's FMLA Retaliation, Breach of Contract, and Wisconsin Wage Payment Claims and Collection Act. A Rule 50 motion tests whether there is a legally sufficient evidentiary basis for a reasonable jury to have found for the plaintiff. In ruling on such a motion, the District Court should have disregarded any jury determination for which there is no legally sufficient basis enabling a reasonable jury to have made it. Now, in terms of whether Ms. Wink was engaged in statutorily protected activity, couldn't the jury have viewed her use of FMLA leave time to care for her son as inextricably intertwined with her work-at-home arrangement? In other words, she wasn't just working at home, she is also caring for her son at home during what would otherwise have been work hours. I agree that for purposes of a Rule 50b motion, when you look at evidence only in favor of the non-movement, that is correct. They could have done that. Unfortunately, what the jury then chose to apparently ignore, as did the District Court in its ruling, is that she was specifically told and specifically testified to the fact that the only thing that was being revoked is her ability to, quote, work from home during those two days, and that at the time that she had her meeting in which she was informed that her flexible work schedule was being revoked along with everyone else's who had a flexible work schedule at the company, she testified that she was specifically told that her FMLA leave would continue, that she would still be able to take FMLA leave during those needed times, but that she needed to be in the office five days a week. But she was going to be restricted to taking her son to doctor's appointments and therapy sessions at the end of the work day. And according to Ms. Wink, she was also told she could no longer have her cell phone on except at lunch in order to receive calls about her son. A jury certainly could interpret that as punitive, could it not? A jury could have interpreted that as potentially interfering with her FMLA claim, and the jury did not find in favor of Ms. Wink for interference. But nothing about the revocation... But they certainly could have found it to be punitive and did. I thought the critical issue was that on Friday she's told she has to, she has to get her so she can come in to the office and work. Isn't that the problem? That she didn't think it was possible to get the child care over the weekend? Ms. Wink testified that it was her understanding she had to have everything in place by Monday, that's correct. There's conflicting testimony, but again, for a woman to be... So is the problem that she couldn't have come in to work Monday because she wouldn't have child care and she can't leave the child at home by himself? Is that a problem? I suppose that is a problem for Ms. Wink. I believe it's an even larger problem, though, for a retaliation claim. No, no, I understand that. But is that her particular concern, that by giving her this Monday deadline they made it impossible for her to go into work because she couldn't... It's very difficult to arrange for child care for the following week during a weekend. The testimony from Ms. Wink was that she was told that she had to commit by Monday as to whether or not she would be able to start working from home. No, she was asked if she could have some additional time. And she was told that the first day that she failed to show up for work in the office, she would be deemed to have voluntarily quit. Now to me, that supports an inference that the company was, in practical terms, firing her, but making it seem as if she was quitting. I mean, that is an impossible situation. And I grant you that, Your Honor. As a mother of three myself, I can appreciate the severity. But what my frustration has been is that everything that we have discussed thus far has been tantamount to an interference claim. Nothing about Ms. Wink's testimony, nothing about the District Court's ruling on the motion, nothing about Ms. Wink's appellate response speaks at all to a retaliation claim. There is no argument, there was no testimony, there is no analysis that there was any retaliatory intent. And this Court is extremely clear that there is a difference between an interference claim under FMLA and a retaliation claim. So are you saying that the jury couldn't have viewed her being actually discharged? In other words, a discharge in all but name only when she was told she could no longer work at home and was advised she had to make other arrangements by Monday, and if she didn't show up, then she was deemed to have voluntarily quit? My problem with the adverse employment action element, whether it's in an interference but even more so in this retaliation count, is that the plaintiff only pursued an actual constructive discharge. There was no jury instruction on constructive discharge, there was no analysis in response to our Rule 50B or 50A to a constructive discharge, and yet now at this very late stage in the proceeding, Ms. Wink would like this Court to examine this under a constructive discharge. That exactly as you indicated, Judge, that things were made so difficult that the financial situation of the company was changed so much that she could no longer work from home two days a week, and so she had no choice but to quit. That's a constructive discharge. That has never been alleged in the complaint. It wasn't proffered at trial, it wasn't included in the jury instructions. The jury, no reasonable jury could have found that she was constructively discharged. Well, you know, reading the briefs, what you seem to be contending is that she wasn't engaging in statutorily protected activity at the time she left the employee, in that flexible work-at-home arrangements are not protected by the FMLA. But what that ignored is the fact that Wink was not only working at home two days a week, which in itself might not be protected activity, but she was using her FMLA leave time to care for her son during those two days a week. And in effect, she's not just working from home two days a week, she's working part-time during those two days because she has to attend to her son, and using FMLA leave to make up the difference. And the company is tracking her use of leave time on that spreadsheet. So when Miller revoked the working arrangement, it's not only informing her she could no longer work at home, but she could no longer use her FMLA leave. So the two aspects of the working arrangement are just so inextricably intertwined. I grant you that this is not a clear-cut Taylor Novotny type example, where she is only at home and performing work throughout the entire time. I think it's important to remember two things, however. Ms. Wink had taken seven FMLA leaves before this work-from-home arrangement, between 2003 and 2011. And she had never worked from home during that period of time. She knew that FMLA leave was non-working. I agree. Now we're in a thornier situation where she's doing both, and it's only the ability to work from home that has been taken away. So long as she has the 12 weeks of intermittent leave left, she could have still continued to work. But there's this problem with arranging childcare. I agree, which to me is why the biggest issue in her retaliation count is the causal connection. Even if we accept that she was engaged in statutorily protected activity, even if we accept that she was engaged in a statutorily protected activity. Well, we have to. Fine. And I am willing to do. So no even ifs. Okay. And even if we accept, or if we accept, or if we are going to accept, that she was terminated, there is still no causal connection. There is still no direct admission. Nobody said I don't understand. I thought, as I started off, I thought it was a simple issue that it wasn't feasible for her to obtain childcare over the weekend, and therefore she wouldn't be able to go into the office on Monday. Because she can't leave, what is it, autistic? Yes. She can't leave him alone. She did come into the office on Monday. She was able to secure childcare for that. But even if that were true, even if that was the reason why. Are you saying she obtained childcare? I don't think there's any evidence in the record as to what her childcare situation was as of that Monday, July 16th of 2012. But what I am saying is that nothing about that scenario rings in an FMLA retaliation claim. Nothing about that says she was targeted. It was the intent of Miller Compressing to get rid of her because she had taken FMLA leave. There is simply no evidence to that. But didn't she tell them that she couldn't, she didn't think she could get childcare over the weekend? So shouldn't they have given her a few more days? What's the big rush about, you know, getting rid of her? Your Honor, it would be very easy for me to sit in her shoes and I see that my white light is on. However, I think that that rings in interference. That does not ring in retaliation, even if that were the case. And the jury found against Ms. Wink on the interference count. Listening to you, Ms. Loren, it seems to me what you're basically arguing is that the jury misunderstood the instructions or misunderstood the verdict for her. They probably should have found that she and the company interfered. It would have been a causal connection and you would have been on the hook. I am stopping short of saying that. And even if that were the case, the district court in ruling on our Rule 50B continued that mistake in treating this case, failing to ignore the necessary elements of FMLA retaliation. Ignoring the causation. That's right. I would like to reserve my rebuttal time unless you have a question. Thank you, Mr. Olson. Thank you. Please. The court defense counsel. Mr. Olson, I'm going to suggest that you do something at the beginning. The closing arguments were not made part of the appellate record in this case. And one problem I've had in reviewing the record in this case is trying to figure out what your theory of the case is with respect to the retaliation claim. It's really not that clear to somebody who wasn't in the weeds at trial. Could you please tell us what you represented to the jury was your theory of the case on the retaliation claim? Your Honor, I have not reviewed that transcript. Recently in my court counsel actually gave the closing argument. I, of course, was there and I understand the theory of the case. You must know what your theory of the case was on retaliation. Absolutely. That's not that clear. Well, and the case law, to be frank, is not clear either. There's plenty of case law that talks about the inextricable nature of those two claims and how they overlap. And there's actually some confusion about which claim applies to which type of activity. So we took the form jury instructions for both claims and I thought those laid out those claims clearly. And we listed in this case with respect to interference as well as retaliation in that there was protected activity, there was a... What was the protected activity? Well, the protected activity, first of all, we need to put it in context. This is not just daycare. This is a disabled boy, three years old. The mom is looking for about a six week transition. Her son is, she used the term kicked out of daycare, two different daycares, because they weren't equipped to handle this violent boy who was kicking, biting, screaming, blooding the noses of his caregivers. So the mom elicits the help of the grandmother, but she can only handle the child three days a week. That leaves Ms. Wink, the plaintiff employee, with two days that she needs that per FMLA time. So the protected activity, Your Honor, is going to the employer. She went to her boss, Mr. Chavez. She went to Ms. Malmstead in HR and said, my son's autistic. We're struggling. We're trying to transition him into a program. I'm on the phone with doctors. We're trying to get him the care that he needs. He's only three years old, so we can't just stick him into any type of program, and he's not suitable for regular daycare. The testimony is unequivocal that Mr. Chavez, as well as Malmstead, knew specifically that the boy was disabled and that she needed this time. As Judge Rovner pointed out, there caring for her son was in a spreadsheet, and her PTO was applied to that. So there was a separate paid time off, Your Honor. Her paid time off was applied. Yes, Your Honor. And so there was a distinction between work time and her time that she was there attending your son. She needs two days a week off until the child is somehow... Right. So that transition is about a six-week period. We're looking at middle of July 2012. She testified at trial that her son did go into a program the first year. He had an IEP, if I'm using the acronym correctly, and now he's doing fine. He was able to transition and get into the program that he needed and get the therapy that he needed. So she's working with her employer. She's communicating with them. Then it escalates up to Ms. Barbian. So the protected activity is the FMLA. It's formally applied for. It's certified by the doctor. The employer accepts it. Now, was the FMLA the time she took off from work, or did it include the fact that she was working at home, in your view? In my view, Your Honor, there was a carve-out. So for those two days, she was doing some work at home, but when she needed to attend to her son and she could not perform work, that time was carved out and designated in the spreadsheet. The notice was given to the employer. They had full access to that spreadsheet, by the way. It was electronic. So HR and Mr. Chavez, the supervisor, were well aware at all times as to what those hours were. So the FMLA-protected activity was the time off? Not the full two days, Your Honor. The non-working time. The non-working time, Your Honor. So it's not the entire two days. Exactly. Now, what evidence was there in the record that when she was told she could no longer work at home, which apparently you admit was not protected by the FMLA, the privilege of working home. She was told she had to come back to the office. Right. What evidence is there in the record that she was told that she could no longer take time, FMLA-protected time off to take care of the needs of her son? Was there evidence in the record to that effect? There's direct evidence. There's documented evidence. And there is testimony, I think, most significantly by the HR person, Ms. Barbian. A juror could have reasonably found testimony by Ms. Barbian not to be believable. She's the individual who met on that Friday afternoon with my client and said, Monday morning, you've got to be here. And if you can't be in the office Monday through Friday on these new set hours, then we will consider you to have voluntarily quit your employment. It was unequivocal. I impeached her during the trial over and over and over again during my direct examination of her adversely, as well as during my redirect examination. Her deposition testimony at pages 68 and 121, she stated that she told Ms. Wink that FMLA was only good for doctor appointments and therapist appointments. She testified that she told Ms. Wink that all kids should be in daycare. She denied it. The jury heard testimony of two individuals. They decided that they didn't believe Ms. Barbian. I put Barbian's testimony up on the screen. She would say one thing. I put her testimony up on the screen and impeached her five, six, seven times on key points in the case. She testified that she left the discharge intentionally vague. And we've cited case law in our brief that it is the duty of the employer to be clear on FMLA, not to leave it vague, to be very specific about the designation. If I may interrupt you there for a moment, sir. Yes, your honor. Your sister indicated that all of that, in her view, all of that testimony seems to show that the company might have interfered with the FMLA leave, but does not show the necessary retaliatory intent to make out a retaliation claim, that there's no causal connection between that kind of activity and a retaliation. But to prevail in this appeal, you would have to be able to show, show us that, that there's some evidence to support a retaliation claim as opposed to an interference claim. What evidence of that do you have? Your honor, that evidence I just mentioned goes directly to retaliation because an HR professional who's telling a mother that every child should be in daycare and that the FMLA can only be used for a purpose other than what this individual is using it for is reasonably construed as having a bias or a retaliatory intent. A reasonable jury could certainly conclude that. Retaliation for what? For her exercise of her FMLA rights, caring for her son and saying, I can't make a change over the weekend. I need to continue exercising my FMLA rights. I see how that's a deference, but I don't see how that's retaliation. Up to that day, both the company and her were on the same page with respect to what she had been doing. It was a change in company policy. And I don't know exactly how the jurors decided one claim versus the other. I suspect that there may have been that type of separation looking at the interference as pre-July 13, 2012 activity. In other words, she was granted her FMLA by the employer and the, she was continuing to use it up until that date. So there was no up until that time. And then she was given the ultimatum and then she was terminated. And that's where the retaliation came in. I don't know exactly how the jury made that decision, but that's a plausible explanation, I think. Well, I think what you're saying is that they decided to punish her for her insistence that she needed this child care, that it would take her a while to arrange it. She couldn't promise to be able to arrange it by Monday. And that seems to have angered them. Is that what you're suggesting? Well, I don't think, Your Honor, we need to establish that it's punishment or that there's anger. We have to show that there is an intent. But how could this person have said to her that you can only use FMLA for a doctor's appointment? It's clearly a false statement. Why would you lie to an employee about that unless you were attempting to use some level of coercion or influence over them to get them to comply? And that's what Barbing was trying to do, sort of strong-arm her at that point into matching the schedule that Barbing wanted. So you're saying they're trying to punish her because she's asserting FMLA rights? I think punishment's a strong word. They wanted to be working in the office, and she says she has to stay home part-time with the child. So that angers them because it interferes with their plans, right? It interferes with their plans. This is not a key employee. She's making $15 an hour working in this recycling plant processing paperwork. She's not a top 10 percent earner. She's not a $100,000 person. They can't claim that they have this exigency that's going to justify their actions. She's either entitled to the protection under the law or she isn't. I think the most compelling evidence in this case was the instruction by Barbian, HR person, to my client in filling out the unemployment compensation form that's found at the appendix, page 40, where Barbian tells her to write in, Miller was able to provide me with a very flexible schedule to care for my disabled child up until July 13, 2012, when they told me they could no longer accommodate me. That's very clear that the cause of the termination was her disabled child and her taking the leave. It couldn't be any clearer. Taking the leave and working at home. It could no longer accommodate me. Disabled child. She's using terms that I think tie in with perhaps her training on the Americans with Disabilities Act. That's not part of this case technically. It sounds like your client didn't understand the difference between working at home and taking leave. Was it that clear in the law at that time? My client... Was it clear in the law at that time that working at home as opposed to the office was not FMLA protected? I don't know that there were many cases on that at that point, Your Honor, but it was certainly clear to my client and clear to the employer who documented and approved it that she would be caring for her because they differentiated it in writing. One explanation for this whole case is that neither the company nor your client understood the difference that the leave that's working at home was not FMLA protected. The employer certainly had a duty to do that, Your Honor. My client is not trained in HR matters. They were intertwined. I'm sorry. The two were intertwined. The two claims are definitely intertwined. Am I correct in understanding that during the two weeks, the two days that she worked at home, she was using a substantial amount of FMLA leave time while she cared for her son on those days? Absolutely. That was documented in the spreadsheet. So her position is that when she's told she can't work at home anymore, she's also told, in effect, in effect, you can't use your FMLA leave time to care for your son at home. Right. And that's correct. And respect to the comment made by defense counsel, I did argue in their motion to the court, in response to that, that this constituted, if not an actual discharge, a constructive discharge by the conduct of the employer, and that's in the record, in the appendix. We have a cross appeal. It's a very short, simple issue. It's the second reduction of the attorney fees of 20%. It's about $25,000. It was based on the analysis of the court in what I believe is an erroneous conclusion that we recovered 50% of the total remedy available. In reality, we recovered 100%. There's no duplication of a remedy. We recovered $60,000, which is rounded up for total back pay, liquidated damages, as well as her breach contract claim and her Chapter 109 claim. So even if we had won on the interference claim in addition to the retaliation claim, my client would not have been able to recover double her back pay amount. So therefore, we recovered 100% of her remedy. So that second reduction found at appendix 251, strike that, found at appendix 134 is based on an erroneous conclusion, and that should be reversed. Okay. Thank you. Thank you, Mr. Olson. Ms. Lauren? Ms. Lauren, was it clear that the privilege of working at home was not protected by the FMLA at the time this lady was working at home? It's been clear since the inception of FMLA that FMLA is a leave of absence. It's leave from work. That was codified in 2014 in Taylor-Navotny, which admittedly was two years post her termination. But there's never been a question whether or not FMLA covers the ability to perform work elsewhere, which was my point in asserting earlier that she had already taken seven leaves before this time and had never performed work or been paid for work during that time. She knew that she was getting some special arrangement, which was why she approached her supervisor for her flexible work schedule at home. Why did they want to let her work at home a few hours a day? In 2012, the company was experiencing extreme... Yes, I know all about that. ...and revoked it from everybody. I know all about that. That's about what they pay her. No, that's not about what they pay her. Yes, it is what they pay her. If they pay her, the work she does at home may not be as valuable as work she does in the office. So, they pay her less. She had been doing her work from home and receiving the same pay. This wasn't a question of her personal... Yes, but look, if they're now squeezed, right? They're squeezed, the company. They're trying to economize. Given that she needs to be at home because of her child, why don't they just say, all right, you want to work a few hours at home. You need the income and so on. That's fine, but we can't pay you what we used to pay you because we're squeezed. So, couldn't they have discussed that with her, the possibility of reducing her hourly pay? There are several issues with that. First of all, they were making reductions across the board. So, they were being forced to make due with less. Look, that doesn't make any sense, reductions across the board. This was an exceptional situation that faces her. They could have made an adjustment. They could have said, we're not letting anybody else work at home, but you have a special problem. You can't come into the office because of your child. We'll let you work at home, but because we're squeezed financially, we can't pay you that $15 an hour. Now, wouldn't that have been the civilized way to take care of this? And respectfully, that kind of an analysis sounds in an FMLA interference claim. You're not talking about the FMLA at all. I'm talking about her efforts to somehow combine the child care with retaining her job in some form. If I had been representing the company at the time, I would have counseled them to do differently. None of that has anything to do with retaliation. There was nothing adduced at trial that shows a causal nexus between her taking two days a week at home to perform some work and to have some FMLA leave that led her to no longer working at the company. There was no direct admission at the time of her meeting with HR that they were doing this because of her leave. What about this person who told her that FMLA is just for, you know, doctor's appointments? The person that made that comment was not the decision maker in picking Ms. Wink to have a meeting at all. The person that was involved in deciding who from her department would be fired as part of this reduction was her supervisor, Matt Chavez. But they decided that she shouldn't be one of them. That's right. She was a very fine employee. That's exactly right. They decided that it should be two other people. That's correct, Your Honor. So what else could it have been but the FMLA situation? It was the fact that, like all other employees who had flexible work schedules, HR met with everyone at the company who had flexible work schedules before terminating anybody to say, okay, guys, you're now going to have to be in the office five days a week. Can you commit to that? There was nothing unique about the fact that they met with Ms. Wink. But how is that cost saving? It makes no sense. What's the difference if I do my work in the office or if I do my work at home as long as I do my work? I don't believe we get the ability of sitting in the shoes of management so long as it's not for a discriminatory purpose. But that's the issue here, isn't it? But there is no testimony, no direct admission that at the time of that meeting she was told, we are meeting with you because you're on FMLA. Well, who would ever do that? What lunatic? Fine. So then we look at the convincing mosaic. There's no suspicious timing. She had been taking her two days from home starting in February, five months earlier. Seventh Circuit case law is clear that five months is far too tenuous. The suspicious time is Monday or you're out of here. And a child that, you know, who can you get to take care of a child like that? Maybe a grandmother. I don't know. The suspicious timing tracks when she requested the FMLA leave and when she separated from the company. She had requested this alternative work arrangement back in February and we've been accommodating it. This is a company that has to study up on personnel relations. Okay. Thank you very much to both counsel. Thank you, Your Honor. It was a pleasure.